Argued May 21, affirmed June 23, reconsideration denied
July 23, petition for review denied September 16, 1975

# GIGLER, *Appellant, v.* CITY OF KLAMATH
## FALLS ET AL (No. 73-19-L), *Respondents.*

### 537 P2d 121

*John L. Hilts,* Medford, argued the cause for appellant. With him on the briefs were Van Dyke, Du-Bay, Robertson & Paulson, P.C., Medford.

*R. L. Marceau,* Bend, argued the cause for respondents City of Klamath Falls and Veatch. With him on

the brief were Panner, Johnson, Marceau & Karnopp, Bend.

*Mel Kosta,* Klamath Falls, argued the cause for respondents Reynolds and Carpenter. With him on the brief were Beebe, Kosta & Brant and Howard K. Beebe, Klamath Falls.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

This appeal is from a judgment of involuntary nonsuit against all of several causes of action the plaintiff asserted against the city of Klamath Falls, its mayor and two of its police officers. The causes of action alleged were for physical injuries incurred in an alleged assault and battery, false arrest, false imprisonment, malicious prosecution, and outrageous conduct against the city and the individual defendants and punitive damages in connection with some of the alleged causes against the individual defendants. For the purposes of this opinion it is unnecessary to detail the various causes alleged. Questions presented on this appeal in essence require a determination, as a question of law upon the established or conceded facts, whether there was justification for removal of plaintiff from a meeting of the city council of Klamath Falls and for his prosecution for disorderly conduct. Incidental thereto are questions of whether undue force was used in plaintiff's removal from the council chamber and ensuing events, and whether any "outrageous conduct" was indulged in by city officials. The causes of action for malicious prosecution, false arrest and imprisonment, assault and battery and outrageous conduct are all dependent upon the facts in evidence which are reviewed below. We have selected for this statement those facts which a glean-

ing of the transcript and the briefs indicate are established without dispute, and which we think are dispositive of the issues.

On October 2, 1972 city council of Klamath Falls held a public hearing on a public works matter. Several people including plaintiff, Andrew Gigler, who were nonresidents of the city attended the meeting with the intention of speaking, but not necessarily upon a subject on the agenda of the public meeting. Plaintiff was one of the latter. The city council has a rule of procedure at council meetings that residents and property owners of the city will be heard at public meetings but restricted time can be allocated to them, because more people seek to talk than there is time for all to be heard as long as they wish. For the same reason it also provides that a nonresident of the city can be heard at a public hearing only after submitting a letter, asking to be heard, at least one week prior to the date of the hearing. This rule against nonresidents being heard can be relaxed at the pleasure of the council. Under the city charter the mayor has the responsibility of presiding at meetings and of enforcing the rules of the council.

During the hearing a Mr. Anklin arose to speak, announcing that he was a nonresident. The mayor cut him off, ruling him out of order. He made a sharp retort but sat down. At this point the plaintiff, Mr. Gigler, who had had previous experience with the rule against nonresidents being heard, arose and protested the ruling against Mr. Anklin according to his testimony:

"A  [Mr. Gigler:]  *  *  *  'Your Honor, Mayor, I felt that Mr. Anklin had the constitutional right to be heard. He was being denied his rights.'

"Q  What did the Mayor say?

"A  He said, 'You are out of order.'  *  *  *

"* * * * *

"A The essence, 'You, too, are not a resident. You are out of order, and we surely at this time are not going to hear you.'

"Q What did you say next?

"A I believe it would reflect again in essence that *I was not going to sit down,* and I wanted this matter to be discussed." (Emphasis supplied.)

He testified he

"* * * stood there, remained on my feet.

"* * * * * *

"* * * I felt that there would be some help from the other Councilmen, and I would be able to further that particular facet of the meeting and bring up some discussion on this matter.

"Q So, you were going to stand there until someone came to your aid?

"A True * * *.

"Q Did anyone come to your aid?

"A No.

"* * * * *

"* * * I hadn't stood there for not more than two or three, four minutes what I might say an ass of myself. I stood there very meekly and kindly, waiting * * *."

The evidence from Mr. Gigler and several other witnesses was that the mayor became quite angry when Mr. Gigler refused to accept the ruling and sit down, and that he vigorously pounded his gavel with the result that he knocked the head off it and it went flying across the room. (Some witnesses testified the mayor said something to the effect "I'm going to get these Goddam nuts out of here," others were indefinite as to what, if anything, he said.) It is established, at least, that the mayor's temper and the public meeting were out of control, and that Mr. Gigler was standing his ground.

The mayor recessed the meeting, saying something about an arrest or a removal of Mr. Anklin and Mr. Gigler. Mr. Gigler was still standing. When the recess was over Mr. Gigler had sat down and as the council meeting resumed two police officers (defendants Reynolds and Carpenter) whom the mayor had called entered the room and the mayor indicated that they should remove Mr. Gigler and Mr. Anklin who were sitting side by side. The police officers proceeded to them. They sought to have the subjects leave the room, asking Mr. Gigler several times to leave peacefully. (The officers knew plaintiff, and called him "Andy.") Mr. Anklin immediately got up and left the room but Mr. Gigler informed the officers they would need reinforcements and he resisted removal. We have viewed an exhibit, a video tape of part of the proceeding which was taken by an attending newsman. It shows that Mr. Gigler did reject what the officers said and then forcibly resisted removal as far as the door through which the three actors departed. The officers, as shown on the tape, used no more force than necessary to accomplish their orders. The testimony is that after the three were outside the room their feet became entangled and all went to the floor. After the police had Mr. Gigler under control, they took him to the police booking room and then placed him for about half an hour in a holding cell known as the drunk tank, where he came in contact with filth and vomit. Plaintiff then posted bail and was released. The testimony of the officers, onlookers and plaintiff himself all indicate that as soon as plaintiff stopped fighting them the officers ceased using physical force.

The events thus related resulted in two counts of disorderly conduct against the plaintiff. The copies of the complaints in the record show one was for disruption of a public meeting and the other for resisting officers. At a jury trial Mr. Gigler was acquitted of

both counts. In his testimony in this case Mr. Gigler stated that when the officers first sought to remove him from the council chamber he was waiting to hear them say he was under arrest but that they never made such a pronouncement. The evidence was controverted as to when words to the effect "you are under arrest" were, if ever, used.

Evidence was produced by plaintiff's witnesses which at the minimum indicates that Mr. Gigler had been a frequent visitor at various governmental public meetings and that he spoke insistently and lengthily upon environmental subjects, and others. As already noted he was well aware by reason of past experience about the rule concerning nonresidents being heard. He had also had difficulties when he had insisted upon being heard at meetings of the Klamath County Commission, and had once been evicted by a deputy sheriff from one of its meetings. Although a nonresident of the city, he testified that he had been active in a recall effort against the mayor.

Plaintiff contends that the trial court erred (1) in holding the order against nonresidents being heard is constitutional; (2) in holding plaintiff failed as a matter of law to make a prima facie case of malicious prosecution; (3) in holding as a matter of law that plaintiff was disrupting a public meeting; (4) in holding as a matter of law that none of defendants could be charged with assault and battery; and (5) in holding that no cause for outrageous conduct was established for jury consideration.

■ In holding that in none of these contentions is the plaintiff correct, we observe that plaintiff's argument ignores or seeks to avoid the fact that by his conduct he made it clear he would continue his defiance of the ruling of the mayor after it was made and knew that his conduct would spark responding anger. He

did continue such conduct for that time it took to stop the public meeting. From the facts at hand, it seemed obvious that plaintiff could be expected to continue similar conduct during the balance of the meeting after the recess—indeed, by his own testimony he affirmed that, for he said it was his intention to talk further on in the meeting about muskrat trapping in a lake in the city. Under the circumstances existing, the mayor was not acting unreasonably in ordering the officers to remove plaintiff from the meeting. If he had gone peacefully, as Mr. Anklin did (and Mr. Anklin urged plaintiff to do the same), it is obvious that no scuffle would have ensued. The officers needed no probable cause for plaintiff's arrest at that point. They were merely following the mayor's orders given in his effort to preside over an orderly meeting while not giving way to wilful obstruction.

■ When the plaintiff chose to violently give physical resistance, he brought about the eventual arrest and prosecution, regardless of the exact time an arrest was made. And that arrest and prosecution was with probable cause.

■ ■ The rule against nonresidents being heard without notice and permission was not unconstitutional, nor was the mayor's action in enforcing it. Plaintiff apparently bases his claim of unconstitutionality on the U.S. Constitution, First Amendment, assuring freedom of speech. The right of free speech is not untrammeled:

"* * * [T]his Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside * * *. On the other hand, general regulatory statutes, not intended to control the content of speech but *incidentally limiting*

*its unfettered exercise,* have not been regarded as the type of law * * * forbade * * *." (Emphasis supplied.) *Konigsberg v. State Bar,* 366 US 36, 49-50, 81 S Ct 997, 6 L Ed 2d 105 (1961).

"* * * One man, with views contrary to the rest of his compatriots, is entitled to the privilege of expressing his ideas by speech or broadside to anyone willing to listen or to read. * * * But that hearing may be limited by action of the proper legislative body to times, places and methods for the enlightenment of the community which, in view of existing social and economic conditions, are not at odds with the preservation of peace and good order.

"This means that the proponents of ideas cannot determine entirely for themselves the time and place and manner for the diffusion of knowledge or for their evangelism * * *." *Jones v. Opelika,* 316 US 584, 594, 62 S Ct 1231, 86 L Ed 1691, 141 ALR 514 (1942), *rev'd on other grounds,* 319 US 103, 63 S Ct 890, 87 L Ed 1290 (1943).

Here, as in a somewhat similar case in New Jersey, *State v. Smith,* 46 NJ 510, 218 A2d 147, *cert denied* 385 US 838 (1966), where the defendants resisted an order for their removal from a public meeting, the right of free speech does not allow one to test the order

"* * * by physical resistance. The remedy, if there is one, must lie elsewhere. Government could not govern if its vital processes could thus be brought to a halt. * * * The chair must have the power to suppress a disturbance or the threat of one, and the power to quell a disturbance would be empty if its exercise could be met by still another disturbance designed to test the officer's judgment." 46 NJ at 517.

■ The claim of constitutional free speech is not a justification for plaintiff's conduct at the public meeting.

■ ■ ■ Plaintiff's assignments of error relating to the trial judge's holdings that plaintiff had not carried his burden as to malicious prosecution and false arrest and imprisonment are largely answered by what we have already said with reference to probable cause. Certified copies of the two complaints, one for disturbing a public meeting after being ruled out of order, the other for fighting with the officers, are in the record. They both charge plaintiff with violating Section 2 of Ordinance 5788 of the Code of Klamath Falls. No such ordinance was pleaded, and no copy thereof is in the record. We do not know what the proscription of the ordinance is, but assume the complaints properly charge offenses thereunder.

We have avoided treating as true any except the undisputed facts in evidence. Taken alone, they indicate that what the New Jersey court said in *State v. Smith,* supra, 46 NJ at 514-15, was true here:

"Callender's point seems to be that his conduct could not be found to disturb or interfere with the quiet or good order of the meeting because he was 'wholly passive.' It toys with words thus to describe his behavior. Rather he resisted removal in affirmative terms, both in locking arms with another and in confronting the officers with his dead weight. And it is idle to say, as does defendant, that 'the crucial element of intention to disturb is consequently totally lacking.' The normal inference is that he intended precisely what he accomplished."

■ Indispensable proof of the causes of action plaintiff asserts under these assignments is that the action taken against him was without probable cause.

"* * * Where there is no conflict in the evidence as to what the circumstances were, the court solely must determine the question of lack of probable cause * * *." *Shoemaker v. Selnes,* 220 Or 573, 581, 349 P2d 473, 87 ALR2d 170 (1960).

"* * * [I]n actions for malicious prosecution the question of probable cause is a question of law which the judge must decide upon established or conceded facts * * *." *Kuhnhausen v. Stadelman,* 174 Or 290, 310, 148 P2d 239, 149 P2d 168 (1944).

■ The trial court correctly proceeded to this determination. There were some disputed facts in the case, but the minimum facts upon which probable cause could be judged are made by the testimony of the plaintiff himself. We agree that the evidence supported the conclusion of the trial court. It was unnecessary for the trial court to also consider other questions that have been argued in briefs, for example, whether the mayor and policemen are immune because they relied upon advice of counsel. We decline to consider these unnecessary questions.

■ ■ The evidence we have reviewed indicates that the evidence of assault was that the physical violence exerted by the officers against plaintiff was no more than necessary to accomplish the legitimate purpose of fulfilling their duty. Therefore, it was justified, as a matter of law, and there was no question to submit to the jury as to the cause alleging assault and battery. ORS 161.235, 161.245, 162.315.

■ ■ The sixth "count" of the fifth amended complaint (the one upon which the trial was had) alleges that plaintiff's expenses and injuries were caused by the "outrageous" conduct of the three individual defendants, and asks $35,000 punitive damages therefor. Substantial question exists whether a cause of action is thus stated. However, the challenge in the fifth allegation of error is that the trial court should not have nonsuited plaintiff on this count. In *Pakos v. Clark,* 253 Or 113, 132, 453 P2d 682 (1969), a tort case based on alleged outrageous conduct, the court said:

"It was for the trial court to determine, in the

first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If the minds of reasonable men would not differ on the subject the court was obliged to grant an order of involuntary nonsuit, which in this case was done."

While it is shown by the evidence that the mayor indeed lost his temper and broke his gavel, it is also shown that his conduct, and that of the officers in removing plaintiff from the meeting, had substantial justification. From that point on, plaintiff's resistance prompted the treatment accorded him. This was not "outrageous" in the sense described in parts of *Pakos* unnecessary to quote here, which is necessary to maintain such a cause of action.

Affirmed.